**IN THE UNITED STATES DISTRICT COURT**
**FOR THE EASTERN DISTRICT OF VIRGINIA**
**Richmond Division**

| | |
|---|---|
| CHAD HILL, on behalf of himself and others similarly situated, | |
| *Plaintiff*, | Civil Action No. 3:22-CV-97 |
| v. | |
| PEPPERIDGE FARM, INC., | |
| *Defendant*. | |

**MEMORANDUM IN SUPPORT OF DEFENDANT'S MOTION TO**
**DISMISS THE COMPLAINT AND TO STRIKE CLASS ALLEGATIONS**

Defendant Pepperidge Farm, Inc. ("Defendant" or "Pepperidge Farm"), by counsel and pursuant to Fed. R. Civ. P. 12(b)(6) and 12(f)(2), submits this Memorandum in Support of Defendant's Motion to Dismiss the Complaint and to Strike Class Allegations.

## I.    INTRODUCTION

Plaintiff is an independent businessman.  On December 15, 2015, he entered into a Consignment Agreement with Pepperidge Farm (the "Agreement") through which he purchased the exclusive right to sell and distribute certain Pepperidge Farm products within a specific geographic territory and to receive substantial commissions on those sales.  The Agreement establishes an independent contractor relationship between Plaintiff and Pepperidge Farm, granting Plaintiff near complete control over his business operations.  Under the Agreement, Plaintiff, among other things, can set his own prices for retail stores, decide which retail stores to solicit to increase his business, decide his own sales and delivery route, and hire his own employees—all with the ultimate goal of increasing profits within his territory.  In his Complaint (ECF No. 1), Plaintiff does

not allege that his relationship with Pepperidge Farm is anything other than what the Agreement describes—an arms-length business relationship through which Plaintiff independently operated his distributorship.

For years, Plaintiff benefitted greatly from his entrepreneurial skills and business relationship with Pepperidge Farm.  With his own truck, office space and equipment, ability to hire his own employees, solicit new stores within his area, and set his own prices with certain retailers, Plaintiff had the opportunity to grow his business and increase the value of his distributorship—all with little oversight from Pepperidge Farm.  Yet, after years from profiting as an independent business owner, Plaintiff has filed a lawsuit challenging that very status by alleging that he was misclassified as an independent contractor.

Each count of Plaintiff's Complaint—(1) failure to pay overtime and minimum wage in violation of the Fair Labor Standards Act (the "FLSA") (Counts I–II); (2) independent contractor misclassification in violation of Va. Code § 40.1-28.7:7 (Count III); (3) failure to pay overtime in violation of the Virginia Overtime Wage Act (the "VOWA") (Count IV); and (4) unpaid wages in violation of Va. Code § 40.1-29 (Count V)—depend entirely on his alleged misclassification as an independent contractor.  But Plaintiff fails to allege sufficient facts to make this alleged misclassification plausible—and it is not even close.  At most, Plaintiff pleads that Pepperidge Farm had the ability to terminate his distributorship and to try to obtain the contracted-for result: adequate sales and distribution of Pepperidge Farm products in Plaintiff's territory.  That is not enough, especially in the face of clear contractual language granting Plaintiff broad discretion in the manner and means of his performance.

Additionally, Plaintiff impermissibly seeks to bring his claims for unpaid wages under Virginia Code § 40.2-29 and unpaid overtime under the VOWA as  Rule 23 class actions, despite a

clear mandate from the Virginia General Assembly that plaintiffs only have the right to bring a representative private cause of action under the FLSA's markedly different collective action procedures. Plaintiff's class allegations constitute an inappropriate attempt to circumvent legislative intent and to improperly expand the new right to proceed collectively created by the General Assembly with the enactment of § 40.2-29(J). These class allegations should be stricken from the Complaint.

## II.   STANDARD OF REVIEW

### A.   Motion to Dismiss Pursuant to Rule 12(b)(6)

To survive a motion to dismiss pursuant to Rule 12(b)(6), Plaintiff must "allege facts sufficient to state all the elements of [his] claim[s]." *Jordan v. Alt. Res. Corp.*, 458 F.3d 332, 346 (4th Cir. 2006), *overruled on other grounds by Boyer-Liberto v. Fontainebleau Corp.*, 786 F.3d 264 (4th Cir. 2015).  "[N]aked assertions of wrongdoing [without] some factual enhancement within the complaint" are not enough.  *Francis v. Giacomelli*, 588 F.3d 186, 193 (4th Cir. 2009) (internal citations omitted).  Instead, Plaintiff's "'factual allegations must be enough to raise a right to relief above the speculative level,' thereby 'nudging their claims across the line from conceivable to plausible.'" *Aziz v. Alcolac, Inc.*, 658 F.3d 388, 391 (4th Cir. 2011) (quoting *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 555, 570 (2007)).  In other words, a complaint "must establish 'facial plausibility' by pleading 'factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged.'" *Clatterbuck v. City of Charlottesville*, 708 F.3d 549, 554 (4th Cir. 2013) (quoting *Iqbal*, 556 U.S. at 678).  While the Court must accept the facts alleged in the Complaint as true, *Edwards v. City of Goldsboro*, 178 F.3d 231, 244 (4th Cir. 1999), bare legal conclusions "are not entitled to the assumption of truth" and are insufficient to

state a claim. *Ashcroft v. Iqbal*, 556 U.S. 662, 679 (2009).  A complaint that fails to state a plausible

claim on its face must be dismissed.  *Iqbal*, 556 U.S. at 679.

In ruling on a motion to dismiss, the Court may consider, not only the allegations in the

complaint, but also any exhibits attached to it. *Fayetteville Invs. v. Com. Builders, Inc.*, 936 F.2d

1462, 1465 (4th Cir. 1991). "[I]n the event of conflict between the bare allegations of the complaint

and an exhibit attached pursuant to Rule 10(c), Fed. R. Civ. P., the exhibit prevails."  *Id.*

### B.       Motion to Strike Pursuant to Rule 12(f)

The Court "may strike from a pleading . . . any redundant, immaterial, impertinent, or

scandalous matter." Fed. R. Civ. P. 12(f). If the complaint alleges a class action under Rule 23, the

Court also may "require that the pleadings be amended to eliminate allegations about representa-

tion of absent persons" Fed. R. Civ. P. 23(d)(1)(D) and strike class allegations before discovery

"if the [they] are 'facially and inherently deficient.'" *Bryant v. King's Creek Plantation, L.L.C.*,

No. 4:20cv61, 2020 WL 6876292, at *2 (E.D. Va. June 22, 2020) (internal citations omitted).

## III.     FACTUAL ALLEGATIONS[1]

Ignoring the conclusory allegations which are not entitled to a presumption of truth, the

Complaint provides virtually no specific factual allegations to support the claims it asserts.  And

the few factual allegations in the Complaint are inaccurate, misleading, contradicted directly by

the document attached to it.

### A.       The Consignment Agreement Establishes an Independent Contractor Rela-
          tionship Between Plaintiff and Pepperidge Farm.

Pepperidge Farm manufactures snack food and packaged baked goods.  Compl., ¶¶ 15-16.

"Consignees" purchase the right to sell and distribute Pepperidge Farm products in exclusive

---

[1] For purposes of this motion only, Pepperidge Farm assumes, as it must, that Plaintiff's factual allegations
are true. It does not, however, assume the truth of any labels and legal conclusions.

territories as independent contractors. *Id.* On December 15, 2015, Plaintiff entered into the Agreement through which he purchased the exclusive right to sell and distribute Pepperidge Farm products in the counties of Nottoway, Lunenburg, Brunswick, Mecklenburg, and Halifax, Virginia and parts of the counties of Campbell, Charlotte, and Pittsylvania, Virginia.  Agreement, ¶ 1 and pp. 8-9.  The Agreement defines Plaintiff as "a self-employed independent businessman, not an agent or employee of [Pepperidge Farm]" and states that the "independent contractor relationship between [Pepperidge Farm] and [Plaintiff] is an essential element of th[e] Agreement." *Id.*, ¶ 15.

The Agreement's central purpose is "to realize the full sales potential" of Pepperidge Farm products in Plaintiff's territory through Plaintiff's independent distributorship. *Id.*, ¶ 4.  To that end, Pepperidge Farm agreed to consign to Plaintiff certain products, which Plaintiff in turn could sell and deliver to retail stores in his territory. *Id.*, ¶ 1.  Pepperidge Farm also agreed that no other person could sell consigned products to retail stores within Plaintiff's territory. *Id.*, ¶ 1.

Plaintiff, for his part, agreed to actively solicit sales from retail stores in his territory "whose accounts can b[e] profitably handled," to "maintain at all times an adequate and fresh supply of [the consigned products] in all such retail stores," and to distribute products to retail stores "at such intervals and with such frequency as is necessary" to make a profit. *Id.*, ¶ 4.  Under the Agreement, Plaintiff receives a percentage of the net proceeds of his sales as commissions. *Id.*, ¶ 3.  The Agreement thus makes clear that Plaintiff—and not Pepperidge Farm—is responsible for making his distributorship profitable and gives Plaintiff nearly complete control over the manner and means of his distributorship's operations.

For certain retail stores, Plaintiff has the ability to sell consigned products "at such prices as [Plaintiff] may determine." *Id.*, ¶ 3(a).  Plaintiff also can extend credit to retail stores at his own risk. *Id.*, ¶ 3(c).  Plaintiff has to provide his own equipment, including a delivery vehicle, necessary

to operate the distributorship. *Id.*, ¶ 5. Plaintiff can hire his own employees and is solely respon-sible for their hiring, firing, training, supervision, and all remuneration and benefits.[2] *Id.*, ¶ 15. If Plaintiff is on vacation or sick, he has to ensure adequate coverage of his territory at his own expense. *Id.*, ¶ 6.

Because Plaintiff's distributorship is an independent business, the Agreement requires him to indemnify Pepperidge Farm from any claims asserted by Plaintiff's employees, including claims regarding payroll, unemployment compensation, and employee benefits. *Id.* For this same reason, Plaintiff also has to ensure his distributorship's compliance with applicable laws and regulations, including "all motor vehicle, food, drug, health and sanitary laws and regulations," and to maintain his own business records and insurance. *Id.*, ¶ 5.

Under the Agreement, Plaintiff ultimately is responsible for running his own business and for using his entrepreneurial skills to make his distributorship profitable. He can solicit retail stores within his territory to increase his sales. *Id.*, ¶ 5. He can determine which retail stores in his territory are more profitable and try to sell additional products to those stores. *Id.* He can decide what prices to charge non-chain retail stores to increase his earnings and the value of his business. *Id.*, ¶ 3. Plaintiff also can sell other products within his territory as long as those products do not compete with Pepperidge Farm's and can (and did) purchase the right to sell Pepperidge Farm products in other territories.[3] *Id.* at ¶ 4.

The Agreement even limits Pepperidge Farm's ability to terminate its contract with Plain-tiff. Although Pepperidge Farm can terminate the Agreement without cause, it requires Pepperidge Farm to pay Plaintiff "a sum equal to (a) the fair market value of the Distributorship on the

---

[2] Plaintiff in fact has an employee who covers part of his territory.
[3] Plaintiff purchased additional territories in 2016 and 2017 and currently operates a vastly expanded dis-tributorship.

termination date plus (b) 25% of such fair market value ….”  *Id.*, ¶ 20.  Additionally, Pepperidge Farm can terminate its independent contractor relationship with Plaintiff “for cause” but only if Plaintiff fails to keep his end of the bargain or otherwise breaches specific contractual requirements.  ¶ 19.

Plaintiff’s distributorship remains a valuable asset that belongs to Plaintiff.  He can sell his distributorship in whole or in part for a profit.  ¶ 18.  If Plaintiff dies during the term of the Agreement, his distributorship’s sales profits for ninety (90) days and any profit upon its sale inure to his estate.  ¶ 22.  In all, under the terms of the Agreement, Pepperidge Farm expected Plaintiff to achieve a contractually agreed result: maintaining a fresh and adequate supply of Pepperidge Farm products within Plaintiff’s territory.  The Agreement, however, left the manner and means by which Plaintiff would accomplish this result up to Plaintiff.

## B.  Plaintiff’s Allegations of Pepperidge Farm’s Control Are Conclusory and Insufficient.

Plaintiff’s Complaint does not plead any facts to establish a relationship different from that which the Agreement describes.  Notably, it is virtually devoid of non-conclusory allegations concerning Pepperidge Farm’s supposed control over Plaintiff’s distributorship.  Although Plaintiff alleges that Pepperidge Farm “closely monitor[ed] and direct[ed] the day-to-day operation of” his distributorship (Compl., ¶ 23(a)), he fails to provide even one specific example.  He does not allege Pepperidge Farm controlled the start and end of his workday, instructed him which customers to contact or visit on which days; determined the order of his daily route, set times for lunch or other breaks, or otherwise played any role in his day-to-day operations.  By its express terms, the Agreement leaves these matters up to Plaintiff.

Plaintiff’s allegation that he was “subject to close oversight by Defendant’s managerial employees, including sales managers” who regularly “evaluate[d] [his] performance” (*id.*, ¶ 29) is

similarly devoid of factual enhancement. The Complaint does not identify any Pepperidge Farm "supervisor" who "oversaw" Plaintiff's performance, provide any examples of such "oversight," or even describe any interactions between Plaintiff and Pepperidge Farm.

Generously construing the Complaint allegations, it alleges, at most, that Pepperidge Farm (1) can terminate its relationship with Plaintiff with or without cause (Compl., ¶¶ 20-21); (2) prohibits Plaintiff from selling competitive products within his territory (*id.*, ¶ 23(b)); (3) limits his territory to the one he actually purchased for his distributorship (*id.*, ¶ 23(c)); (4) requires him to keep track of his sales (*id.*, ¶¶ 31-32) —which sales information Pepperidge Farms then uses to pay his commissions (*id.*, ¶ 10); (5) retains the right to reduce his territory or limit the allotment of product if Plaintiff fails to keep his end of the bargain (*id.*, ¶¶ 23(d)-(f); 30); and (6) has to grant permission for Plaintiff to sell to chain store warehouses, hotels, restaurants, and individual consumers (*id.*, ¶ 23(h)). In other words, the Complaint alleges only that Pepperidge Farm determined the scope of independent distributorship service it contracted Plaintiff to provide and retains the right to take remedial measures if Plaintiff fails to adequately provide the contracted-for services.[4] It, however, does not allege that Pepperidge Farm determines when, where, and how Plaintiff performed those services.

---

[4] Further, Plaintiff's allegations concerning the Agreement often are inconsistent with the Agreement's plain text. For example, Plaintiff's claim that he lacked discretion over his customer base and product pricing (Compl., ¶ 23(g)) is squarely at odds with Paragraph 3 of the Agreement, which expressly grants Plaintiff the permission to solicit retail stores for business, to decide which retail stores to market for additional sales, to determine his own sales strategies and efforts, and to sell "to retail stores at such prices as [Plaintiff] may determine." Agreement ¶ 3. Plaintiff also expanded his customer base by acquiring additional stores through transactions with other distributors in 2016 and 2017. Similarly, Plaintiff's allegation that the Agreement prohibits him from distributing products outside his territory (Compl., ¶ 23(c)) makes little sense given the exclusive nature of Plaintiff's territory. Pepperidge Farm would be in breach of the Agreement if it allowed another individual to sell its products within Plaintiff's territory or allowed Plaintiff to sell products in another individual's exclusive territory.

IV.     **ARGUMENT**

Plaintiff's Complaint is factually and legally deficient. First, it fails to plausibly plead the threshold requirement for each of Plaintiff's claims: an employment relationship between him and Pepperidge Farm.  Stripped of its conclusory assertions devoid of factual enhancement, the Complaint asserts only that Pepperidge Farm can terminate its business relationship with Plaintiff, expects Plaintiff to perform his contractual obligations by selling to and servicing the customers in his territory, and consigns its products to Plaintiff rather than selling the products to him outright. These allegations fall well short of establishing an employment relationship even at the pleading stage.  Second, compounding the Complaint's factual deficiencies, it improperly asserts class claims under statutory provisions that, by their clear and unambiguous terms, may only be asserted in representative actions pursuant to the opt-in requirements of the FLSA.  These fatal flaws render the Complaint devoid of any viable claims.

**A.     Plaintiff's Failure to Allege an Employer-Employee Relationship Is Fatal to His FLSA and Virginia Statutory Claims.**

The existence of an employment relationship is a necessary prerequisite for each of Plaintiff's claims—one which he fails to plausibly plead.  Indeed, the Complaint and the Agreement reveal that Plaintiff is not a Pepperidge Farm "employee."  Instead, Pepperidge Farm contracted for his services as an independent contractor.

*i.     Plaintiff Fails to Plausibly Allege Employee Status under the FLSA, the VOWA, or Va. Code § 40.1-29 (Counts I – II and IV – V).*

Pepperidge Farm may not be held liable under the FLSA, VOWA, or Va. Code § 40.1-29 unless it is Plaintiff's "employer" and Plaintiff its "employee."  29 U.S.C. § 216(b) ("Any employer who violates the [FLSA] shall be liable to the employee or employees affected in the amount of their unpaid minimum wages or their unpaid overtime compensation."); Va. Code § 40.1-29.2 (adopting the FLSA's definition of "employ"). Where, as here, the plaintiff fails to adequately

allege an employment relationship with the defendant, dismissal is appropriate. *Acosta v. JM Osaka, Inc.*, 270 F. Supp. 3d 907, 911–12 (E.D. Va. 2017) (dismissing complaint for failure to plead an employment relationship); *Gough v. Bankers Life & Cas. Co.*, No. PJM 17-2341, 2019 U.S. Dist. LEXIS 23175, * 8-12 (D. Md. Feb. 12, 2019) (same); *Tall v. Md. Developmental Disabilities Admin.*, No. ELH-15-3811, 2016 U.S. Dist. LEXIS 82259, * 15-18 (D. Md. June 24, 2016) (same).

The Fourth Circuit applies the "economic realities" test to determine whether an employment relationship exists. *McFeeley v. Jackson St. Ent., LLC*, 825 F.3d 235, 241 (4th Cir. 2016) (quoting *Schultz v. Cap. Int'l Sec. Inc.*, 466 F.3d 298, 304 (4th Cir. 2006)). "The touchstone of the economic realities test is whether the worker is economically dependent on the business to which he renders service or is, as a matter of economic reality, in business for himself." *Id.* In applying this test, Courts look at six factors:

> (1) [T]he degree of control that the putative employer has over the manner in which the work is performed;
> (2) the worker's opportunities for profit or loss dependent on his managerial skill;
> (3) the worker's investment in equipment or material, or his employment of other workers;
> (4) the degree of skill required for the work;
> (5) the permanence of the working relationship; and
> (6) the degree to which the services rendered are an integral part of the putative employer's business.

*Id.* Although "[n]o single factor is dispositive," to survive a motion to dismiss, a plaintiff must allege sufficient facts to establish employee status on "the totality of circumstances presented." *Gough*, 2019 U.S. Dist. LEXIS 23175, at * 8-12 (applying economic realities test in granting motion to dismiss); *Tall*, 2016 U.S. Dist. LEXIS 82259, at * 15-18 (same); *see also Acosta*, 270 F. Supp. 3d at 912 (dismissing plaintiff's FLSA claim because plaintiff failed to allege sufficient

facts to establish an employment relationship with the defendant).   Plaintiff's few non-conclusory allegations do not satisfy this standard.

The degree of control a putative employer has over an alleged employee is the most important factor in determining employee status.   *Smith v. CSRA*, No. 20-1377, 12 F.4th 396, 2021 U.S. App. LEXIS 26390, * 31 (4th Cir. Sept. 1, 2021) (citation omitted). A worker, however, does not automatically become an employee the moment a company exercises any control over him. *McFeely,* 466 F.3d at 242.   "After all, a company that engages an independent contractor seeks to exert some control, whether expressed orally or in writing, over the performance of the contractor's duties and over his conduct on the company's premises.   It is rather hard to imagine a party contracting for needed services with an insouciant 'Do whatever you want, wherever you want, and however you please.'"   *Id.*, at 242-43.   Accordingly, the control factor looks specifically to the extent of a putative employer's control over the manner of an alleged employee's performance— not over the ultimate goal of the work to be done.   *Chao v. Mid-Atlantic Installation Servs.*, 16 F. Appx. 104, 106 (4th Cir. 2001) (finding no control over cable installers even though the defendant assigned them daily routes and required them to report their progress periodically where the installers were "free to complete the jobs within their routes in whatever order they wish; to attend to personal affairs or conduct other business during the day; to choose and manage their own employees to help them complete their work orders; and to work independently or together with other [i]nstallers.") (internal citation omitted).

The Agreement establishes that Plaintiff—and not Pepperidge Farm—controls Plaintiff's distributorship.   Constrained by the plain text of the Agreement, Plaintiff offers only conclusory allegations insufficient to establish an employment relationship.   Indeed, Plaintiff's allegations of control relate solely to oversight of the Agreement's ultimate goal—maintaining a fresh and

11

adequate supply of Pepperidge Farm products—and not to the manner in which Plaintiff was to accomplish that goal.  For example, Plaintiff alleges that Pepperidge Farm prohibited him from distributing products outside his territory, from distributing competing products within his territory, and from selling directly to certain establishments.  Compl., ¶¶ 23(b), (c), and (h).  But these are mere limitations on the scope of Plaintiff's distributorship—not control over the manner of his performance.  Plaintiff also alleges that Pepperidge Farm set his sales goals, monitored his sales volume, retained the right to reduce his territory or limit his allotment of product if he failed to meet the needs of his customers, and retained the right to inspect and take possession of the consigned products.  Compl., ¶¶ 23(e), (f); 29, 30, 31.  But these are mere examples of contract oversight—not control of his day-to-day activities. Simply "requiring [Plaintiff] to meet [Pepperidge Farm's contract] specifications is entirely consistent with the standard role of a contractor."  *Herman v. Mid-Atlantic Installation Servs.*, 164 F. Supp. 2d 667, 672-73 (D. Md. 2000), *aff'd sub nom. Chao*, 16 F. Appx. 104; *see also id.* ("It is in the nature of a contract that the contractor promises to deliver the performance bargained by the client.").

The Complaint, on the other hand, fails to provide even a single specific example of the type of control required to plead an employment relationship: no allegations that Pepperidge Farm set Plaintiff's hours of operation, determined the clients he solicited and visited each day, specified his sales and delivery route, or otherwise engaged in any day-to-day instructions or oversight.  To the contrary, the Consignment Agreement requires only that Plaintiff maintain a fresh and adequate supply of Pepperidge Farm products in his territory and "use his best efforts to realize the full sales potential of the Territory for Consigned Products" but leaves the "how" of accomplishing this result exclusively to Plaintiff.  Even ignoring the plain text of the Agreement and assuming Plaintiff's allegations are true, "[t]he degree of control [Plaintiff alleges in his Complaint] is no more

than would be used for any other independent contractor performing a task for a business ….” *Lane v. David P. Jacobson & Co. Ltd.*, 880 F. Supp. 1091, 1099 (E.D. Va. 1995).

In short, the Complaint does not allege the type of control over “the manner in which the work is to be performed necessary to characterize the relationships between [Plaintiff] and [Pepperidge Farm] as one of employee/employer.” *Chao*, 16 F. Appx. at 106; *Gough*, 2019 U.S. Dist. LEXIS 23175, at * 8-12 (granting motion to dismiss where the plaintiff alleged only a “minimal degree of control [by the defendant] over” the plaintiff’s work); *see also Carter v. Raiser-Ca, LLC*, No. 17-cv-00003-HSG, 2017 U.S. Dist. LEXIS 150349, * (N.D. Cal. Sept. 15, 2017) (dismissing wage and hour claim for failure to plead employment relationship and finding allegations that the defendant “can control when and how drivers earn fares” and “may terminate drivers or require them to take additional training” insufficient even at the pleading stage.).

The Complaint similarly falls short on the second factor: opportunity for profit and loss. Although it alleges that Pepperidge Farm paid Plaintiff “a percentage of sales made within [his] territory” (Compl., ¶ 10), the Complaint fails to describe the manner in which Plaintiff could increase those sales (*i.e.,* his profits). The Agreement, however, does. Plaintiff is responsible for soliciting business from retail stores, extending credit to customers as appropriate, obtaining new customers, setting his own prices, and otherwise operating his distributorship to maximize profit. Agreement, ¶¶ 3–5. Plaintiff could hire his own employees if he determined it would help his business. *Id.*, ¶ 15. If Plaintiff increased the value of his distributorship through his own entrepreneurial efforts, he could sell the distributorship at a profit. *Id.*, ¶ 18.

Under the Agreement, Plaintiff’s opportunity for profit and loss depends on his own entrepreneurial skill and ability to manage his business. “Ultimately, [Plaintiff’s] opportunities for profit or less depended on [his] own efforts, since [Pepperidge Farm] paid [him] entirely by

commission ….." *Gough*, 2019 U.S. Dist. LEXIS 23175, at * 11; *see also Lane*, 880 F. Supp. at 1099 (being paid on "a straight commission basis, is indicative of an independent contractor relationship"). By investing in time and effort into his business, Plaintiff could grow his sales and the value of his distributorship. *Spiteri v. Russo*, No. 12-CV-2780, 2013 WL 4806960, at *59 (E.D.N.Y. Sept. 7, 2013) (dismissing the plaintiff's claims because, among other things, he had the ability to earn more money by investing more into the business); *see also Franze v. Bimbo Bakeries USA, Inc.*, 826 F. App'x 74, (2d Cir. 2020) (finding the second factor weighed in favor of independent contractor status where, as here, distributors for a baked goods manufacturer invested in purchasing their delivery routes and "could have grown their sales with smaller customers with whom they could exercise greater freedom in negotiating prices.") (internal quotation marks and citation omitted).

On the other hand, if Plaintiff could not sell the consigned product or left too much expired product unsold, he would be responsible for the losses. This opportunity for both profit and loss negates Plaintiff's conclusory assertions of an employment relationship with Pepperidge Farm. *FedEx Home Delivery v. N.L.R.B.*, 563 F.3d 492, 498 (D.C. Cir. 2009) ("The fact that many carriers choose not to take advantage of this opportunity to increase their income does not mean that they do not have the entrepreneurial *potential* to do so.") (emphasis in original) (alterations and internal quotation marks omitted).

The Agreement also is clear on the third factor—Plaintiff's investment in the tools of his business. It mandates that Plaintiff supply and maintain his own delivery vehicle, computer, office space, and any other equipment necessary to operate his distributorship, including the distributorship's accounting, inventory, and billing functions. Agreement, ¶ 5. Plaintiff does not allege any facts to the contrary.

On the fourth factor, Plaintiff's conclusory allegation that his "position [] requires no skill or training, aside from a normal driver's license" not only is insufficient, *Dietelbaum*, 2016 WL 8136650 at * 3 (rejecting a list of allegedly clerical activities performed by plaintiff as sufficient to allege that his work lacked discretion), but also contrary to the Agreement and common sense. As the operator of his own distributorship, Plaintiff had to use his "best efforts to realize the full sales potential of the Territory" and to actively solicit sales from retail stores. Agreement, ¶ 4. In that regard, the success of Plaintiff's distributorship depended on his skills as a salesman and ability to manage inventory, logistics, staffing, and other aspects of his business. "[T]he skills required of a salesperson are often specialized, and therefore conducive to work as an independent contractor." *Lane*, 880 F. Supp. at 1099.

Plaintiff's allegations as to the first four factors of the "economic realities" test are woefully insufficient. Thus, even assuming Plaintiff has adequately pled the final two factors (longevity of the relationship and importance of Plaintiff's services to Pepperidge Farm's business), "[t]he economic reality test, applied here, points persuasively to the conclusion that the complaint fails to state sufficient facts warranting the plausible inference" of an employment relationship on the "totality of the circumstances." *Acosta*, 270 F. Supp. 3d at 912.

The Agreement establishes that Plaintiff owned and operated an independent business with little oversight by Pepperidge Farm over its day-to-day operations. Plaintiff's conclusory allegations—the vast majority of which have no bearing on the "economic realities" factors—are not enough for the Court to find otherwise. As such, Plaintiff's FLSA, VOWA, and Virginia unpaid wage claim (Va. Code § 40.1-29) must be dismissed.

        ii.    *Plaintiff Fails to Plausibly Allege Employee Status Under Va. Code § 40.1-28.7:7 (Count IV).*

Plaintiff's claim for violation of Va. Code § 40.1-28.7:7 fails for the same reason: he has

15

not pled sufficient facts to plausibly establish that he was misclassified as an independent contractor. Va. Code § 40.1-28.7:7 adopts the Internal Revenue Service's ("IRS") definition of an independent contractor, which relies on the common law test. Va. Code § 40.1-28.7:7(B). This test, which is similar to the FLSA's "economic realities" test,[5] considers, among other factors, (1) whether the putative employer "has the right to control and direct the individual who performs the services, not only as to the result to be accomplished by the work but also as to the details and means by which that result is accomplished" (*i.e.*, "what shall be done" *and* "how it shall be done"); (2) "the right to discharge" the worker; (3) who furnishes the worker's tools; and (4) the place of work. 26 U.S.C. § 3121(d)(2); 26 C.F.R. § 31.3121(d)-1(c)(2).

Plaintiff's allegations fall equally short of plausibly pleading an employment relationship under the common law test as they do under the "economic realities" test. As set forth above, the Complaint lacks any non-conclusory allegations that Pepperidge Farm controls Plaintiff's performance beyond the result to be accomplished. Pepperidge Farm, just like any person or entity that engages an independent contractor, identifies the ultimate goal—maintaining a fresh and adequate supply of Pepperidge Farm products within Plaintiff's territory. Agreement, ¶ 4. But the manner in which Plaintiff meets that goal, as the Agreement plainly provides, is up to Plaintiff himself. *Id.* Under the Agreement, Plaintiff supplies his own tools and equipment, works outside Pepperidge Farm's premises, decides whether to hire his own employees, determines which retail stores

---

[5] The National Labor Relations Act ("NLRA") also utilizes the common law test. *See FedEx Home Delivery*, 563 F.3d at 495–96 (citation omitted). There is functionally little difference between the FLSA economic realities test and the common law test. *Murray v. Principal Fin. Grp., Inc.*, 613 F.3d 943, 945 (9th Cir. 2010). Both tests look to many of the same factors in determining whether the economic realities of the relationship, or the degree of control exercised over the worker, renders the worker an employee. A National Labor Relations Board Regional Director has found that Pepperidge Farm "Consignees" are independent contractor and not employees under the same facts Plaintiff alleges in his Complaint. *Pepperidge Farm, Inc.*, No. 01-RC-155159, 2015 NLRB Reg. Dir. Dec. LEXIS 167 (Aug. 15, 2015). That ruling was affirmed on review.

to solicit for additional business, and determines the price to charge retail stores. *Id.*, ¶ 5. Plaintiff's services also are not exclusive to Pepperidge Farm. He is free to provide sales and distribution services for other manufacturers, with the same equipment and employees, in the same area, and to the same customers on a non-competitive basis (*e.g.,* selling non-baked goods to retail stores) and outside his territory without any limitation. This is the essence of an independent contractor relationship.

On this issue, the decision in *FedEx Home Delivery* is particularly instructive. In that case, the court found delivery drivers with agreements and business relationships similar to Plaintiff's in all relevant respects to be independent contractors under the common law test.[6] In that case, as here, the delivery drivers signed independent contractor agreements which did not prescribe hours of work or other details of performance, such as what routes to follow. *FedEx Home Delivery*, 563 F.3d at 497–500. Likewise, as here, the delivery drivers had to provide and maintain their own vehicles at their own cost—but which they also could use for other commercial or personal purposes. Finally, as here, the delivery drivers could independently incorporate their delivery businesses, contract to service multiple routes, and were allowed to hire their own employees. Stated simply, the allegations in this case *are identical* to the facts in *FedEx Home Delivery.* Given that the Complaint lacks any factual allegations to differentiate it from *FedEx Home Delivery*, the conclusion must be the same: Plaintiff was an independent contractor, not an employee. *See also Franze*, 826 F. App'x at 76-79 (finding independent distributors for a baked goods manufacturer to be independent contractors under circumstances identical to those Plaintiff alleges in the Complaint and described in the Agreement).

---

[6] Although *FedEx Home Delivery* was not decided on a motion to dismiss, the factual record in that case closely mirrors Plaintiff's allegations in the Complaint.

Plaintiff's allegations do not plausibly allege that he was an employee under either the "economic realities" or the common law test. Because not one of Plaintiff's claims can exist without an employer-employee relationship, each must be dismissed.

### B. Plaintiff Fails to Plausibly Allege Violations of Statutory Minimum Wage and Overtime Requirements.

Plaintiff's minimum wage and overtime claims under the FLSA and VOWA are insufficient in yet another respect.  He fails to allege sufficient facts to sustain them.

"To establish a claim for nonpayment of minimum wages . . . , the complaint must at least allege approximate wages such that the Defendants will be able to frame a meaningful response." *Seagram v. David's Towing & Recovery, Inc.*, 62 F. Supp. 3d 467, 473 (E.D. Va. 2014).  Simply stating that "the defendant failed to pay minimum wage" is not enough absent some factual enhancement. *Alley v. Quality Eco Techs., LLC*, Civil Action No. 3:20cv355, 2021 WL 1196188 at * 8 (E.D. Va. March 29, 2021) (dismissing plaintiff's minimum wage claims where the plaintiffs "do not allege more than mere labels and conclusions that QET . . . failed to pay them minimum wages based on the Installers' commission payments.").  Plaintiff's Complaint fails on this basic requirement. Nowhere does he allege "approximate wages" or provide any other information from which Pepperidge Farm can "frame a meaningful response."

Plaintiff's allegations of overtime violations are equally lacking. A "plaintiff[] seeking to overcome a motion to dismiss must do more than merely allege that [he] regularly worked in excess of forty hours per week without receiving overtime pay." *Hall v. DirectTV, LLC*, 846 F.3d 757, 777 (4th Cir. 2017); *see also Alley*, 2021 WL 1196188 at * 9 ("Although the Court notes that well-settled law does not require that the Installers identify a *particular* week in which they worked uncompensated overtime hours, the Installers must do more than merely allege that they regularly worked in excess of forty hours per week without receiving overtime pay."); *Trotman v. AM Retail*

*Grp., Inc.*, Civil No. 4:20cv125, 2020 WL 9347968, at * 3 (E.D. Va. Nov. 12, 2020) (rejecting a plaintiff's proposed amendment as insufficient because the plaintiff failed to allege how much she was paid for the hours she claims she worked).

Yet, that is all Plaintiff has done. Compl. at ¶¶ 11, 26, 43.  Where, as here, the plaintiff fails to provide an "estimate[] [of] the length of [his] average workweek during the applicable period and the average rate at which [he] was paid, the amount … of wages [he] believes [he] is owed, or any other facts that will permit the court to find plausibility," his overtime claim cannot survive a motion to dismiss.  *Hall*, 846 F.3d at 777.

C.     **The Court Should Strike Plaintiff's Impermissible Class Allegations in Counts IV and V.**

Although the Court need not reach this issue because Plaintiff's Complaint fails to state any claim upon which relief can be granted, Plaintiff's class allegations in Counts IV and V are impermissible as contrary to the plain statutory language of Virginia Code §§ 40.1-29 and 40.1-29.2.  Plaintiff's claims for violation of Virginia Code §§ 40.1-29 and 40.1-29.2 must be brought under the collective action procedures applicable to the FLSA.  For this reason, the Court should strike his impermissible Rule 23 class allegations as to Counts IV and V of the Complaint.

Effective July 1, 2020, Virginia Code § 40.1-29 was amended to add a private cause of action for violations of either §§ 40.1-29 or 40.1-29.2:

> In addition to any civil or criminal penalty provided by this section, and without regard to any exhaustion of alternative administrative remedies provided for in this section, if an employer fails to pay wages to an employee in accordance with this section or § 40.1-29.2, **the employee may bring an action, individually, jointly, with other aggrieved employees, or on behalf of similarly situated employees as a collective action consistent with the collective action procedures of the Fair Labor Standards Act, 29 U.S.C. § 216(b),** against the employer in a court of competent jurisdiction.

Va. Code Ann. § 40.1-29(J) (emphasis added).

By using the phrase "the employee *may* bring an action," Virginia Code § 40.1-29 provides that the newly created private cause of action may be utilized "in addition" to the remedies already available under the statute (*i.e.*, civil or criminal penalties). *Id.* The statute lists three ways in which an employee may (*i.e.*, is permitted to) bring such an action: (1) individually, (2) jointly, or (3) on behalf of others through a *collective* action following the specific procedures outlined in the FLSA's Section 216(b). *Id.* If the private action is going to be brought on behalf of others (as opposed to individually or jointly), the language clearly states it must be brought through a collective action following the specific procedures outlined in the FLSA's Section 216(b). When listing these three options, the General Assembly did not use permissive language or otherwise suggest *other* options for private litigation are available when bringing an action on behalf of others. Indeed, while the General Assembly could have clarified if these three options were not exclusive by adding language such as "among others" or "including, but, not limited to," it did not do so here.

Under standard principles of statutory interpretation and absent explicit legislative intent to the contrary, terms are to be given their plain and ordinary meaning. *Reardon v. Herring*, 191 F. Supp. 3d 529, 537 (E.D. Va. 2016). "And, of course, courts must assume that the legislature chose, with care, the words it used when it enacted the relevant statute, and courts are bound by those words as they interpret the statute." *United States v. Davis*, 692 F. Supp. 2d 594, 598 (E.D. Va. 2010) (internal citations omitted). Further, when assessing for plain meaning, courts must not consider statutory phrases in isolation but instead must read the statute as a whole. *Moore v. Frazier*, 941 F.3d 717, 727 (4th Cir. 2019).

The Virginia General Assembly intentionally chose to create a private right of action on a representative basis only under the opt-in collective action procedures. It created, for the first time,

a private cause of action under Virginia Code § 40.1-29 and in so doing, circumscribed the right to bring such claims as representative actions.  Va. Code Ann. § 40.1-29(J).  If the General Assembly had wished to allow for the Rule 23 enforcement method for Virginia Code § 40.1-29, it would have explicitly done so or at a minimum clarified that the three statutory options were not exclusive by adding language such as "among others" or "including, but not limited to." That it did not is telling.

Additionally, the General Assembly's specific reference to the collective action procedure is significant because both in this jurisdiction and across the country, courts have consistently highlighted the "fundamental, irreconcilable difference" between the collective action procedure outlined in the FLSA's Section 216(b) and the class action procedure outlined in Rule 23. A collective action is "fundamental[ly]" different than a Rule 23 class.[7] *See, e.g., Choimbol v. Fairfield Resorts, Inc.*, 475 F. Supp. 2d 557, 562, n.6 (E.D. Va. 2006). "Rule 23(c) provides for 'opt out' class actions while FLSA § [2]16(b) only permits those who 'opt in' to join the class. *These two types of class actions are mutually exclusive and irreconcilable*." *Gagliastre v. Capt. George's Seafood Rest., LP*, No. 2:17cv379, 2018 WL 9848234, at *1 (E.D. Va. Oct. 4, 2018) (internal citations omitted) (emphasis added). If the General Assembly contemplated that suit

---

[7] The United States Congress has made this same intentional choice with the Age Discrimination in Employment Act ("ADEA"). This Court has previously acknowledged and rejected a plaintiff's attempt to bring a Rule 23 class action ADEA claim on this basis.  In *Cooke v. Reynolds Metals Co.*, a plaintiff brought a claim pursuant to the Age Discrimination in Employment Act ("ADEA") on behalf of a Rule 23 class despite the ADEA's adoption of the FLSA's collective action procedure.  65 F.R.D. 539, 540 (E.D. Va. 1975).  The Court found that "use of Rule 23 is inappropriate because of the F.L.S.A. requirement of notice to the Secretary of Labor and its requirement that a consent be filed by each 'similarly situated' party." *Id.* ("The Court concludes that Rule 23 is inapplicable to this situation and that the purported class of plaintiffs have not met the consent requirements of 29 U.S.C. § 216(b) which are prerequisites to a class action under that section.").   In another decision reaching the same conclusion, a court noted that "Congress at the time the [ADEA] was adopted was well aware of Rule 23 of the Federal Rules. If congress had wished to adopt the Rule 23 enforcement technique for the Age Discrimination Act, it would not have explicitly stated that the Act was to be enforced in accordance with the Fair Labor Standards Act." *Hill v. W. Elec. Co.*, 76 F.R.D. 4, 6 (M.D.N.C. 1976).

could be brought at the election of a private party either collectively *or* as a class action, it would not have exclusively listed the collective procedure.

Plaintiff is attempting to impermissibly expand the statutory right to bring a private cause of action provided by the General Assembly. The right to bring a private cause of action on a representative basis exists only under the opt-in collective action procedures of the FLSA. This limitation was intentional, and Plaintiff's attempt to expand the scope of the right to a private cause of action provided by the statute is improper. His class allegations should be stricken from Counts IV and V.

## V.    CONCLUSION

Pepperidge Farm respectfully requests that the Court grant its Motion to Dismiss, dismiss all counts in Plaintiff's Complaint in full and with prejudice, and award such other relief as the Court deems proper.

Dated: April 18, 2022

Respectfully submitted,

/s/ Igor Babichenko

Christopher M. Michalik
Virginia Bar No. 47817
Igor Babichenko
Virginia Bar No. 78255
Paul T. Atkinson
Virginia Bar No. 92876
Laura J. Cooley
Virginia Bar No. 93446
McGuireWoods LLP
Gateway Plaza
800 East Canal Street
Richmond, VA 23219
Tel: 804-775-1000
Fax: 804-775-1061
cmichalik@mcguirewoods.com
ibabichenko@mcguirewoods.com
patkinson@mcguirewoods.com
lcooley@mcguirewoods.com

*Counsel for Pepperidge Farm, Inc.*

## CERTIFICATE OF SERVICE

I hereby certify that on the 18th day of April, 2022, I electronically filed the foregoing with the Clerk of the Court using the CM/ECF System, which will send a notification of such filing (NEF) to all counsel of record.

_/s/ Igor Babichenko_
Igor Babichenko
McGuireWoods LLP
Gateway Plaza
800 East Canal Street
Richmond, VA 23219
Tel: 804-775-1000
Fax: 804-775-1061
ibabichenko@mcguirewoods.com
