**IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF VIRGINIA
RICHMOND DIVISION**

| | |
|---|---|
| CHAD HILL, on behalf of himself and others similarly situated,<br><br>　　　　　Plaintiff,<br><br>　　v.<br><br>PEPPERIDGE FARM, INC.,<br><br>　　　　　Defendant. | Civil Action No. 3:22-cv-97 |

**AMENDED CLASS AND COLLECTIVE ACTION COMPLAINT[1]**

Chad Hill ("Plaintiff"), on behalf of himself and all others similarly situated, files this Class and Collective Action Complaint ("Complaint") against Pepperidge Farm, Inc. ("Defendant" or "Pepperidge Farm"), and in support states the following:

1.　　The named Plaintiff and putative Plaintiffs are current and former Pepperidge Farm "Consignees" who worked in Virginia within the three years preceding the filing of this Complaint. Plaintiffs were classified and compensated as Independent Contractors by Pepperidge Farm.

2.　　Plaintiff and those similarly situated are employees of Pepperidge Farm and have been misclassified. Through this proceeding they seek to recover unpaid overtime wages, unpaid regular wages, and all other allowable damages and recoveries pursuant to the Fair Labor Standards Act as well as Virginia State law. They also seek to recover damages associated with their misclassification pursuant to § 40.1-28.7:7.

---

[1] This filing is made in accordance with the Court's verbal leave to file an Amended Complaint at the hearing held on June 2, 2022.

**Jurisdiction and Venue**

3.      This Court has jurisdiction over this matter pursuant to 29 U.S.C. § 216(b), 28 U.S.C. §§ 1331, 2201, 2202 and Plaintiff seeks this Court's supplemental jurisdiction pursuant to 28 U.S.C. § 1367.

4.      Venue is proper in this District under 28 U.S.C. § 1391 because the events forming the basis of this suit occurred in this District.

5.      Defendant is subject to personal jurisdiction in the Commonwealth of Virginia.

**Nature of this Lawsuit**

6.      Defendant is a large baker and distributor of packaged snack food, bakery, and bread products sold to consumers throughout the U.S. and in other countries at thousands of groceries, convenience, and other stores.

7.      Though referred to as a "Consignee" and/or Independent Contractor, Defendant employed/employs the Plaintiff to deliver and stock its products to stores in an assigned territory, primarily comprised of cities and towns within Southwest Virginia.

8.      Defendant employed Plaintiff and other individuals who performed identical job duties within unique assigned Virginia territories.

9.      As was the case with the Plaintiff, Defendant labeled/labels all such individuals as Consignees and/or Independent Contractors.

10.      Defendant paid Plaintiff, and those similarly situated, a percentage of sales made within their territory.

11.      Defendant's Consignees regularly worked over 40 hours per week and were not paid overtime for those hours over 40.

**The Parties**

12.    Plaintiff is a Virginia resident and has worked for Defendant as a Consignee in Virginia, within Counties in the Richmond Division of the Eastern District of Virginia (including Brunswick, Nottoway, and Mecklenburg Counties) since at least 2015.

13.    Defendant is a Connecticut corporate entity that is licensed to do business in Virginia and maintains its principal office at 595 Westport Ave, Norwalk, CT, 06851, USA.

14.    Defendant's parent company, Campbell Soup Company is a public company with stock trading on the New York Stock exchange under the ticker "CPB."

**Factual Allegations**

15.    Defendant manufactures and distributes snack food and packaged bake goods for retail sales.

16.    Defendant distributes its products to stores through Consignees like the Plaintiff and those similarly situated.

17.    In order to deliver product on behalf of Defendant, Consignees are required to contract with Defendant through a boilerplate Consignment Agreement.  A copy of the Consignment Agreement was previously filed with the Court.  *See* [Doc. 1-2].

18.    The Consignment Agreement purports to set forth all aspects of the relationship between Consignees and Defendant and declares that Consignees are "Independent Businessm[e]n" and refers to the relationship as an "independent contractor relationship" rather than an employment relationship.

19.    Under the terms of the Consignment Agreement, Consignees are made to pay for the right to deliver and distribute Defendant's product within their assigned territory, but all meaningful and actual control over the product and territory belongs to the Defendant. Moreover,

according to the annual report of Defendant's parent company, the loans used by Plaintiff and many other similarly situated Consignees to finance the purchase of such routes are guaranteed by the Defendant's parent company (worth an approximate value of $199M as of the 2020 fiscal year end). Additionally, the Defendant may deduct from money otherwise owed to a Consignee attendant to product delivery if that Consignee owes money associated with the guarantee.

20. The Defendant maintains discretion to terminate the Consignment Agreement at any time without cause. Further, Consignees are not allowed to sell their routes, or any part of their route without Defendant's subjective approval of the purchaser.

21. Additionally, the Consignment Agreement's broad and purely subjective "for cause" termination provisions create a still further level of control for the Defendant, including, but not limited to:

    a. "Failure of Consignee adequately to realize the sales potential of the Territory[….],"

    b. "Failure of Consignee to perform or comply with any material term or provision of this Agreement [….]"

    c. "Any dishonesty of Consignee in his/her dealings with Bakery or with others in connection with Consignee's distribution[….]"

    d. "Any actions, activities or practices of Consignee which either do, or *in the opinion of Bakery* are likely to, materially damage the reputation of Bakery and/or Bakery's relations or reputation [….] (emphasis added)

22. Despite the Consignment Agreement's attempt to characterize the relationship, an individual's employee status under the FLSA is determined by "economic realities of the relationship between the worker and the putative employer," *Schultz v. Capital International*

*Security, Inc.*, 466 F.3d 298, 304 (4th Cir. 2006).

23.    The economic reality of the relationship between the Defendant and the Plaintiff, and those similarly situated, is that of an employment relationship. Both factually, and set out in the Consignment Agreement, the Plaintiff, and those similarly situated, are, and have been misclassified as Independent Contractors. Indeed, very little separates their employment from that of a standard delivery-person employee. For example:

a.    Defendants closely monitor and direct the day-to-day operation of Consignees. Consignees have little to no discretion or authority to deviate from the sales plans and product placements which Pepperidge Farms itself establishes with its customers (mainly chain retailers), nor the location, pricing, or products they stock at such retailers.

i.    For example, Consignees may only deliver product to chain retailers who have contracted with Pepperidge Farm to stock Pepperidge Farm products.  Consignees do not contract with the retailers and merely service Pepperidge Farm-Retailer relationships.

ii.    Consignees do not choose or suggest which items will be stocked on retailer shelves, nor even the location on the shelves where product will be placed.  Rather, such determinations are made by the retailer, or Pepperidge Farm, or a combination of those two in conjunction with each other, but not by the Consignee.  When Consignees see that a retailer is low on a product any order they request is filled, or not filled, as is often the case, at Pepperidge Farm's sole discretion.

iii.    Consignees are subject to discipline through an "escalation process"

wherein retailers can make complaints about Consignees and/or product directly to Pepperidge Farm, which then may take disciplinary action including and up to seizure of territory against the Consignees for the perceived failure(s) including, but not limited to, product being out of stock at customer locations, neatness of products on shelves, frequency of deliveries at given customer locations, attire and appearance while delivering product.

    iv.  Consignees can also be disciplined for the matters above by Pepperidge Farm with no customer initiation.

b. The Consignment Agreement prohibits Consignees from distribution of products competitive to Defendant.

c. The Consignment Agreement prohibits Consignees from distributing Defendant's product outside of their assigned territory.

d. The Defendant retains the right to allocate product as it sees fit within a Consignee's territory.

    i.  For example, Pepperidge Farm customers serviced by Plaintiff may be out of a given product, but Plaintiff may only deliver products (and amounts of same) as allotted to him by Pepperidge Farm, at Pepperidge Farm's unilateral control. Plaintiff has no control over whether Pepperidge Farm allots the amount and type of product he requests.

e. The Defendant may reduce a Consignee's territory if the Defendant is not satisfied that the territory or stores within the territory are being appropriately serviced by the Consignee.

i. For example, Plaintiff has been repeatedly and consistently threatened by Pepperidge Farm with reduction or seizure of territory because Pepperidge Farm claimed insufficient service by Plaintiff, most recently in March of this year.

ii. Moreover, even if a problem has been caused by Pepperidge Farm such as providing Plaintiff with the wrong product or insufficient quantities of product, Pepperidge Farm deems Plaintiff responsible for any such issues. On one occasion in March of this year, Plaintiff was disciplined by Pepperidge Farm with an escalation for a shortage caused by Pepperidge Farm's having provided him a delivery that was short 32 of 93 trays ordered and the trays that were delivered included numerous products which had not even been ordered.

f. The Defendant may reduce or discontinue a Consignee's allotment of product should it, subjectively, determine that the Consignee has failed to fulfill any obligation of the Consignment Agreement.

g. Consignees are not permitted discretion in their customer base nor in product pricing nor in the way Defendant's products are displayed once in stores.

i. Products are to be stocked in stores on predetermined shelves and shelf space. Pepperidge Farm maintains a "planogram" for each store indicating shelf location and product space. Consignees are not given access to "planograms" nor are they consulted in the development of same.

ii. Plaintiff is not permitted to solicit chain retail stores in his territory as

new customers. Pepperidge Farm retains sole authority to negotiate and contract with chain retailers and supermarkets, which are the type of stores that orders products on any meaningful scale.  Such retailers make up the overwhelming majority of Plaintiffs route and represent the Plaintiff's only opportunity to profitably operate as a consignee within the confines of the Consignment Agreement.   On information and belief, the same holds true for most, if not all, Consignees.  The ability to service and sell to such retail stores is a matter of contract between Pepperidge Farm its retail customers.  Plaintiff's sole role is to deliver product to such stores.  Plaintiff may also not deviate from Pepperidge Farm pricing to these customers.

h.  Absent Defendant's permission, Consignees are not allowed to deliver to chain store or chain store warehouses..

i.  The position of Consignee requires no special skill or training, aside from a normal driver's license.

    i.  Consignees' actual duties are confined to delivering and stocking Defendant's product at Defendant's customer locations, in the specific shelves and location(s) determined by Pepperidge Farm's customers, and ordering more product when product at customer locations runs low.

j.  Consignees tend to have long term relationships with the Defendant.

k.  The function of the Consignees is essential and integral to Defendant's operations.  Without them, Defendant's product would not be delivered and

stocked by stores and would never be sold to consumers.

24.    Consignees use a variety of vehicles for the purpose of distributing Defendant's products including personal automobiles weighing significantly less than 10,000 pounds.

25.    For instance, on at least a weekly basis, Plaintiff used a vehicle which weighed less than 10,000 pounds, and did not use a trailer, for delivery routes that were close to his home.

26.    Consignees are required by Pepperidge Farm to use handheld mobile devices that must be able to run Pepperidge Farm software in connection with servicing Pepperidge Farm customers.   Consignees are required to purchase and/or update these handheld devices at the discretion, and for the benefit, of Pepperidge Farm.   Pepperidge Farm offers financing for the purchase of these devices which is paid back through deductions from Consignee weekly pay. Aside from simple inventory tracking, the devices themselves are used to provide Pepperidge Farm the additional benefit of granular data concerning Consignee performance, which can be, and is, used to assess Consignee performance.

27.    Consignees regularly work more than 8 hours a day and 40 hours a week.   For the period prior to the onset of the Covid-19 pandemic, Plaintiff estimates he worked approximately 60 hours per week for the Defendant.   For the period following, Plaintiff estimates he has worked 45-50 hours a week.

28.    Defendant pays Consignees commissions based on sales and/or deliveries made to stores.   Consignees were not paid a salary and received no minimum payment from Defendant.

29.    Consignees were misclassified as Independent Contractors, and as such:

    a.   They received no overtime premium when they worked more than 40 hours in a week.

    b.   Their compensation was illegally charged back for inventory gaps or

irregularities, pallet fees, escalations (e.g., out of stock fines), and various 'offenses' such as having too much stale product.

    c.  Defendant failed to keep track of the hours they worked or provide pay record reflecting the hours worked.

30.    Consignees are subject to close oversight by Defendant's managerial employees, including sales managers. Pepperidge Farm sales managers regularly evaluate the performance of Consignees.

    a.  For example, Plaintiffs' performance is micromanaged and has been evaluated by numerous different Pepperidge Farm employees and Plaintiff has received "escalations" from multiple Pepperidge Farm employees. In the last year alone, Plaintiff has had to answer to at least the following Pepperidge Farm managerial employees: Brenda Rhodes, Chad Rose, David Preston, Jeff Taylor, David Eberhart, and James Grant. Similarly, Plaintiff estimates he has received approximately 35 escalation communications from Pepperidge Farm in the last year. Such communications often concern alleged product shortages and the Pepperidge Farm managerial employee's mandate(s) that the shortage be addressed immediately. On one occasion, Plaintiff was visited, unannounced, at a customer location by Pepperidge Farm employee, Mr. Rose, who threatened to take the Plaintiff's territory due to a shortage of product (although this visit occurred at the customer location while Plaintiff was at the store to deliver product in response to the shortage).

    b.  Pepperidge Farm management often visit Customer locations within a consignee's territory, without announcement, and whether or not deliveries are

being made that day, for the specific purpose of assessing Consignee performance and/or disciplining Consignees.

31.   Moreover, Defendant not only establishes sales goals which Consignees are required to meet but controls a Consignee's ability to meet the goal.  For example, one such goal requires Consignees to ensure that product is 98% in stock daily at each Pepperidge Farm customer they service.  However, due to Pepperidge Farm's unilateral ability to decide what products are allocated, and how much product is allocated, this 'goal' is impossible for Consignees to always meet.  Where a Consignee's performance is deemed wanting, the Defendant may send correction letters if not remedied to the Defendant's satisfaction, this can lead to the removal of portions of territories, or to full termination of a Consignee's contract.

32.   When Pepperidge Farm's retailer customers launch internal programs or initiatives that touch upon Consignees' delivery roles, Pepperidge Farm advises Consignees of the existence of (and requirement to adhere to) such programs.  By way of example, a large grocery chain customer of Pepperidge Farm recently implemented a new product tracking program.  Plaintiff has been instructed by Pepperidge Farm that he is required to adhere to the customer's new program in its totality.

33.   The Defendant requires Consignees to keep records of sales and deliveries and maintains the right to review and inspect Consignee records and products. The Defendant has the additional right to take possession of Consignee's physical inventory as often as it desires.

34.   Defendant tracks Consignees' performance, through scanning software which Defendant requires its Consignees to purchase directly from Defendant.

35.   Defendant is an "enterprise" as defined by the FLSA in 29 U.S.C. § 203(r)(1).

36.   Defendant is an enterprise engaged in commerce or in the production of goods for

commerce as defined by the FLSA in 29 U.S.C. § 203(s)(1)(A).

37.     Defendant has made more than $500,000 in sales made or business done in each of the last three calendar years.

38.     During his employment, Plaintiff was an "employee" of Defendant as defined by the FLSA in 29 U.S.C. § 203(e).

39.     During his employment, Defendant was Plaintiff's "employer" as defined by the FLSA in 29 U.S.C. § 203(d).

**Collective Action Allegations**

40.     Plaintiff brings his FLSA claim as a collective action and his consent to join this collective action as a representative Plaintiff was previously filed with this Court. *See* [Doc. 1-3].

41.     The collective action is defined as follows:

All Consignees who were classified as independent contractors and worked for Defendant within the borders of the Commonwealth of Virginia, who drove a vehicle weighing less than 10,000 pounds in any workweek, and who worked more than 40 hours in any workweek within three years from the date he/she files a consent form to participate in this lawsuit ("Collective Action Members").

42.     Plaintiff is similarly situated to the potential Collective Action Members because they were paid in the same manner, performed the same primary job duties, and were subject to identical and/or near identical Consignment Agreements and other attendant contracts with the Defendant.

43.     In the last three years, Defendant employed individuals who performed the same primary job duties as Plaintiff.

44.     Plaintiff, and those similarly situated, performed the same primary job duties, were classified as independent contractors exempt from the overtime and/or minimum wage provisions of the FLSA, were paid only on a commission basis, and were subject to deductions or

12

chargebacks.

45.     Of Consignees classified as independent contractors who performed the same primary job duties as Plaintiff in the last three years, some or all worked over 40 hours in individual workweeks.

46.     Of Consignees classified as independent contractors who performed the same primary job duties as Plaintiff in the last three years, some or all worked during weeks where they were made to expend out-of-pocket costs that were for Defendant's benefit and to absorb various Defendant mandated deductions.  Taken together, these expenditures and deductions meant that in certain weeks, Plaintiff, and others similarly situated, may have earned less than the minimum wage.

47.     Defendant has names, addresses, phone numbers, and email addresses for potential Collective Action Members in its payroll or personnel or consignee records.

48.     Defendant is aware or should have been aware that the FLSA required it to pay potential Collective Action Members overtime if they are employees rather than independent contractors.

49.     Defendant assigned the Collective Action Members routes and duties that could not be completed in 40 hours or less per week.

50.     Based on the size of the routes, Defendant had actual or constructive knowledge that the Collective Action Members spent more than 40 hours per week working for Defendant.

51.     Within the last five years alone, the Defendant, as well several other companies operating within the snack food space have faced lawsuits regarding misclassification of Consignees and other differently titled, but similarly functioning, so-called independent contractors.

### Class Action Allegations

**A.     Class Definition**

52.     Plaintiff, the Rule 23 Class Representative, seeks to maintain claims pursuant to Va. Code §§ 40.1-28.7:7, 40.1-29, and 40.1-29.2, individually, and on behalf of classes of current and former Consignees who:

a) During any time since July 1, 2020, were misclassified as independent contractors and were assigned and/or worked routes primarily or exclusively within Virginia;

b) During any time since July 1, 2020, were misclassified as independent contractors and were assigned and/or worked routes primarily or exclusively within Virginia and who were subject to improper wage deductions by Defendant; or

c) During any time since July 1, 2021, were misclassified as independent contractors and were assigned and/or worked routes primarily or exclusively within Virginia and who worked more than 40 hours in a workweek without receiving overtime compensation.

53.     On information and belief, there is near total overlap in the classes referenced above, as Plaintiff and all others similarly situated all were made to assent to the same Consignment Agreement, the same [mis]classification as an Independent Contractor, and the same demanding work requirements.

**B.     Efficiency of Class Prosecution of Common Claims**

54.     Certification of subclasses of current and former Consignees is the most efficient and economical means of resolving the questions of law and fact which are common to the claims of the Class Representative and the proposed subclasses. Conversely, proceeding on an individual

basis will require the filing of potentially scores of duplicative individual suits which will waste judicial time and resources and create the risk of inconsistent or varying adjudications of common issues.

### C.    Numerosity and Impracticality of Joinder

55.    The subclasses which the Class Representatives seek to represent are so numerous that joinder is impracticable. On information and belief, the putative subclasses during the liability periods number over 50 current and former Consignees who have been misclassified and paid/treated as independent contractors by the Defendant, and who were subject to underpayment of regular and overtime wages.

### D.    Common Questions of Law and Fact

Defendant's use of Consignees and the propriety of its classification of Consignees present common issues of fact in this matter.  Moreover, because Consignees are all made to sign the same boilerplate contracts and agreements, the challenged pay and classification practices apply uniformly and present identical questions of law and fact with respect to the Class Representative and those whom he seeks to represent.

### E.    Typicality of Claims and Relief Sought

56.    The claims of the Class Representative are typical of those of the class members as a whole in that their claims are based on the same contract and business and compensation practices. The relief sought by the Class Representative for unpaid wages and misclassification compensation is also typical of the relief which is sought on behalf of the proposed subclasses.

### F.    Adequacy of Representation

57.    Plaintiff is an adequate class representative for all subclasses. His interests are co-extensive with those of the members of the proposed subclasses he seeks to represent.

Additionally, there is substantial, perhaps complete, overlap amongst the membership of the subclasses. Plaintiff has knowledge of the Consignment Agreement as well as an intimate knowledge of the Consignee position. He is committed to being a representative of the subclasses, and has retained counsel experienced in prosecuting class action employment cases to protect the interests of the class.

### G. Rule 23(B)(3) Requirements

58.     Common questions of law and fact predominate over any questions affecting only individual members because the basis of the claims herein is the common application of the Consignment Agreement, as well as Defendant's practice of treating its Consignees as independent contractors.  Such policies and practices are applicable to all putative subclass members.

59.     A class action is superior to other available methods for adjudicating the controversy because other methods would involve the filing of numerous individual claims that are based on the same centralized scheduling and compensation facts and the same legal issues regarding same. Numerous individual cases similar to Plaintiff's would clog the Court's docket and waste judicial time and resources. Moreover, multiple individual cases based on the same legal issue(s) could lead to inconsistent or varying adjudications of the same issue(s).

60.     The putative subclass members do not have a substantial interest in individually controlling a separate action because any such claim would be based on the same centralized contractual compensation practices and their recovery in either an individual or class action will be based on the amount of wages, overtime compensation, or other damages that each Plaintiff has been denied by Defendant.

61.     The Class Representative and counsel are not aware of any other litigation concerning the controversy that has already begun by proposed subclass members within the

Commonwealth of Virginia.

62.     It is desirable to concentrate the claims in this forum because the employment practices complained with respect to the Class Representative occurred in this forum.

63.     The Class Representative and counsel do not foresee any substantial difficulties in managing a class action and counsel is experienced in managing class action litigation in this forum.

## COUNT I
### Violation of the Fair Labor Standards Act Failure to Pay Overtime Compensation
### (Collective Action)

64.     This count arises from Defendant's violation of the FLSA by failing to pay overtime to Plaintiff and the Collective Action Members when they worked over 40 hours in individual workweeks.

65.     The Collective Action Members were not exempt from the overtime provisions of the FLSA.

66.     Plaintiff, and others similarly situated, are/were directed by Defendant to work, and did work, over 40 hours in one or more individual workweeks.

67.     Defendant paid Plaintiff, and others similarly situated, on commissions only and did not pay them overtime compensation.

68.     Defendant violated the FLSA by failing to pay overtime to Plaintiff, and others similarly situated, at one-and-one-half times their regular rate of pay when they worked over 40 hours in one or more individual workweeks.

69.     Defendant's failure to pay Plaintiff and other similarly situated persons one-and-one-half times their regular rate for all time worked over 40 hours in a workweek was willful.

## COUNT II
### Violation of Va. Code § 40.1-28.7:7
### (State Law Misclassification Class Action)

70.     Va. Code § 40.1-28.7:7 permits misclassified workers to bring an action for damages against violating employers.

71.     Plaintiff, and others similarly situated, performed services for Defendant for renumeration.

72.     Plaintiff, and others similarly situated, were misclassified as independent contractors despite not meeting the "Internal Revenue Service guidelines" for evaluating independent contractor status.

73.     Plaintiff, and others similarly situated, are entitled to damages caused by such misclassification, including wages, salary, employment benefits, including expenses incurred by the employee that would otherwise have been covered by insurance, and impermissible chargebacks or deductions or other compensation lost, plus reasonable attorneys' fees and costs incurred in bringing this action.

## COUNT III
### Violation of Va. Code § 40.1-29.2
### (Virginia Overtime Wage Act Class Action)

74.     The Defendant has knowingly violated the Virginia Overtime Wage Act, Va. Code § 40.1-29.2, by failing to pay overtime to Plaintiff and the Collective Action Members when they worked over 40 hours in individual workweeks.

75.     Plaintiff, and all others similarly situated, were not exempt from the overtime provisions of Va. Code § 40.1-29.2.

76.     Plaintiff, and others similarly situated, are/were directed by Defendant to work, and did work, over 40 hours in one or more individual workweeks.

18

77.     Defendant paid Plaintiff, and others similarly situated, on commissions only and did not pay them overtime compensation.

78.     Defendant violated Va. Code § 40.1-29.2 by failing to pay overtime to Plaintiff, and others similarly situated, at one-and-one-half times their regular rate of pay when they worked over 40 hours in one or more individual workweeks.

79.     Defendant's failure to pay Plaintiff and other similarly situated persons one-and-one-half times their regular rate for all time worked over 40 hours in a workweek was willful or knowing.

80.     Pursuant to Va. Code §§ 40.1-29(J) and 40.1-29.2, Plaintiff and others similarly situated are entitled to recover payment of their unpaid overtime wages, an equal amount of liquidated damages, prejudgment interest, and attorneys' fees.  Further, Defendant's violation was a "knowing" one thus entitling Plaintiff and others similarly situated to recovery of triple damages.

81.     Plaintiff brings this action for all violations alleged herein commencing July 1, 2021, and ongoing.

**COUNT IV**
**Violation of Va. Code § 40.1-29**
**(Unpaid Wages Class Action)**

82.     The Defendant has knowingly violated Va. Code § 40.1-29 by failing to pay Plaintiffs the regular wages for necessary and compensable time spent working for Defendant.

83.     Because Plaintiff, and those similarly situated, were misclassified as independent contractors, they were made to expend out-of-pocket costs that were for Defendant's benefit and absorb various Defendant mandated deductions.  These expenditures and deductions represent improper reductions in the wages of the Plaintiff, and others similarly situated.

84.      Pursuant to Va. Code § 40.1-29(J), Plaintiffs are entitled to recover their unpaid

and/or deducted wages, an equal amount of liquidated damages, prejudgment interest, and attorneys' fees.  Further, Defendant's violation was a "knowing" one thus entitling Plaintiffs to recovery of triple damages.

85.    Plaintiff brings this action for all violations alleged herein commencing July 1, 2020, and ongoing.

WHEREFORE, Plaintiff, on behalf of himself and the Collective and/or Class Action Members, requests the following relief against Defendant as follows:

A.    That the Court conditionally certify this action as a Collective Action under the FLSA and order that Court approved notice be issued to putative collective members;

B.    All unpaid overtime due to Plaintiff and the Collective Action Members;

C.    Liquidated damages equal to the unpaid overtime compensation due to Plaintiff and the Collective Action Members;

D.    That the Court certify this action as a Class Action Pursuant to Rule 23 of the Federal Rules of Civil Procedure;

E.    All unpaid wages and overtime damages due to Plaintiff and members of the State Law Class Action claims;

F.    All unpaid wages, salary, or benefits due as result of Defendant's misclassification scheme;

G.    Liquidated damages equal to the unpaid overtime and/or unpaid wage compensation due under Va. Code § 40.1-29(J) and 40.1-29.2;

H.    Treble damages under Va. Code § 40.1-29(J) for all claims where such relief is available;

I.      Reasonable attorneys' fees and costs incurred in filing and prosecuting this lawsuit

pursuant to the FLSA and/or Virginia law; and

J.      Such other relief as the Court deems appropriate.


**Jury Demand**

Plaintiff demands a trial by jury.

Respectfully Submitted,
**Chad Hill**
Plaintiff

By: _/s/ Zev H. Antell_____
Harris D. Butler, III, (VSB No. 26483)
Craig Juraj Curwood (VSB No. 43975)
Zev H. Antell (VSB No. 74634)
Paul M. Falabella (VSB No. 81199)
Butler Curwood, PLC
140 Virginia Street, Suite 302
Richmond, VA 23219
Telephone: (804) 648-4848
Facsimile: (804) 237-0413
harris@butlercurwood.com
craig@butlercurwood.com
zev@butlercurwood.com
paul@butlercurwood.com

Aaron S. Book (VSB No. 43868)
Steven T. Webster (VSB No. 31975)
Webster Book LLP
abook@websterbook.com
swebster@websterbook.com
300 N. Washington St., Suite 404
Alexandria, VA 22314
Phone and Fax: 888-987-9991
Cell: 202-281-4890


*Attorneys for the Plaintiff, all subclasses, and
others similarly situated*

## **CERTIFICATE OF SERVICE**

I hereby certify that on June 9, 2022, I electronically filed the foregoing with the Clerk of the Court using the CM/ECF system, which will send a notification of such filing (NEF) to the following:

Christopher M. Michalik, Esq.
Igor Babichenko, Esq.
Paul T. Atkinson, Esq.
Laura J. Cooley, Esq.
McGuireWoods LLP
Gateway Plaza
800 East Canal Street
Richmond, VA 23219
Tel: 804-775-1000
Fax: 804-775-1061
cmichalik@mcguirewoods.com
ibabichenko@mcguirewoods.com
patkinson@mcguirewoods.com
lcooley@mcguirewoods.com

*Counsel for Pepperidge Farm, Inc.*

By:  /s/ *Zev H. Antell*
 Zev H. Antell (VSB No. 74634)
BUTLER CURWOOD, PLC
140 Virginia Street, Suite 302
Richmond, Virginia 23219
Telephone: (804) 648-4848
Facsimile: (804) 237-0413
Email: zev@butlercurwood.com

*Attorney for Plaintiff Chad Hill, et al.*